# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| KATHERINE BURAK, on behalf of herself and all others similarly situated,<br><br>        Plaintiff,<br><br>v.<br><br>THE UNIVERSITY OF MASSACHUSETTS CHAN MEDICAL SCHOOL,<br><br>        Defendant. | Case No. _____<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Katherine Burak, individually and on behalf of all similarly situated persons, alleges the following against The University of Massachusetts Chan Medical School ("Defendant") based upon personal knowledge with respect to herself and on information and belief derived from, among other things, investigation by her counsel and review of public documents, as to all other matters:

## I.     INTRODUCTION

1.      Plaintiff brings this class action against Defendant for its failure to properly secure and safeguard Plaintiff's and other similarly situated plan members and/or beneficiaries' sensitive information, including full names; dates of birth, and Social Security numbers ("personally identifiable information" or "PII").

2.      Defendant is Massachusetts' "first and only public academic health sciences center"[1] and "provides services to the Massachusetts Executive Office of Health and Human Services, including MassHealth, the State Supplement Program, the Executive Office of Elder

---

[1] https://www.umassmed.edu/about/ (last visited Aug. 28, 2023).

Affairs, and Family Resource Centers.[2]

3.     Former and current recipients of benefits administered or offered by Defendant, including "State Supplement Program (SSP) participants (including recipients, other members of the household and authorized representatives), MassHealth Premium Assistance members, MassHealth Community Case Management participants, and Executive Office of Elder Affairs (EOEA) and Aging Services Access Points (ASAP) home care program consumers,"[3] are required to entrust Defendant with sensitive, non-public PII, in order to obtain services from Defendant. Defendant retains this information for at least many years and even after the relationship has ended.

4.     By obtaining, collecting, using, and deriving a benefit from the PII of Plaintiff and Class Members, Defendant assumed legal and equitable duties to those individuals to protect and safeguard that information from unauthorized access and intrusion.

5.     On or about June 1, 2023, Defendant "learned that security flaw in MOVEit allowed unauthorized access to some of the files that were shared using this software."[4] In response, Defendant "launched an investigation" into the scope and nature of the Data Breach.[5] As a result of its investigation, Defendant concluded—on July 27, 2023—that Plaintiff's and Class Members' PII was compromised in the Data Breach.[6]

6.     According to Defendant's untitled letter sent to Plaintiff and Class Members (the "Notice Letter"), and publicly available reports, the compromised PII included individuals' names; dates of birth; and Social Security numbers and may also have included includes the person's mailing address, protected health information like diagnosis and treatment details, Social Security

---

[2] The "Notice Letter".

[3] https://www.cbsnews.com/boston/news/umass-chan-data-breach-massachusetts-moveit/

[4] *See* Notice Letter

[5] *Id.*

[6] *Id.*

number, and financial account information.[7]

7.     Defendant failed to adequately protect Plaintiff's and Class Members PII—and failed to even encrypt or redact this highly sensitive information. This unencrypted, unredacted PII was compromised due to Defendant's negligent and/or careless acts and omissions and their utter failure to protect Class Members' sensitive data. Hackers targeted and obtained Plaintiff's and Class Members' PII because of its value in exploiting and stealing the identities of Plaintiff and Class Members. The present and continuing risk to victims of the Data Breach will remain for their respective lifetimes.

8.     Plaintiff brings this action on behalf of all persons whose PII was compromised as a result of Defendant's failure to: (i) adequately protect the PII of Plaintiff and Class Members; (ii) warn Plaintiff and Class Members of Defendant's inadequate information security practices; and (iii) effectively secure hardware containing protected PII using reasonable and effective security procedures free of vulnerabilities and incidents. Defendant's conduct amounts at least to negligence and violates federal and state statutes.

9.     Defendant disregarded the rights of Plaintiff and Class Members by intentionally, willfully, recklessly, or negligently failing to implement and maintain adequate and reasonable measures and ensure those measures were followed by its IT vendors to ensure that the PII of Plaintiff and Class Members was safeguarded, failing to take available steps to prevent an unauthorized disclosure of data, and failing to follow applicable, required, and appropriate protocols, policies, and procedures regarding the encryption of data, even for internal use. As a result, the PII of Plaintiff and Class Members was compromised through disclosure to an unknown and unauthorized third party. Plaintiff and Class Members have a continuing interest in ensuring

---

[7] https://www.cbsnews.com/boston/news/umass-chan-data-breach-massachusetts-moveit/

that their information is and remains safe, and they should be entitled to injunctive and other equitable relief.

10.     Plaintiff and Class Members have suffered injury as a result of Defendant's conduct. These injuries include: (i) invasion of privacy; (ii) lost or diminished value of PII; (iii) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (iv) an increase in spam calls, texts, and/or emails; and (v) the continued and certainly increased risk to their PII, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the PII.

11.     Plaintiff and Class Members seek to remedy these harms and prevent any future data compromise on behalf of herself and all similarly situated persons whose personal data was compromised and stolen as a result of the Data Breach and who remain at risk due to Defendant's inadequate data security practices.

## II.     PARTIES

12.     Plaintiff, Katherine Burak, is, and at all times mentioned herein was, an individual citizen of Rutland, Massachusetts.

13.     Defendant, The University of Massachusetts Chan Medical School, is a Massachusetts-based medical school with its principal place of business located at 55 Lake Avenue North, Worcester, Massachusetts, 01655.

## III.     JURISDICTION AND VENUE

14.     The Court has subject matter jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2). The amount in controversy exceeds $5 million, exclusive of

interest and costs. The number of class members is over 100, many of whom reside outside the state of Massachusetts and have different citizenship from Defendant. Thus, minimal diversity exists under 28 U.S.C. §1332(d)(2)(A)

15.     This Court has jurisdiction over Defendant because Defendant operates in this District.

16.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(a)(1) because Defendant's principal place of business is located in this District, a substantial part of the events giving rise to this action occurred in this District, and Defendant has harmed Class Members residing in this District.

## IV.     FACTUAL ALLEGATIONS

### *Defendant's Business*

17.     Defendant is Massachusetts' "first and only public academic health sciences center"[8] and "provides services to the Massachusetts Executive Office of Health and Human Services, including MassHealth, the State Supplement Program, the Executive Office of Elder Affairs, and Family Resource Centers (collectively, the "Massachusetts Public Assistance Programs").[9]

18.     Plaintiff and Class Members are current and former beneficiaries of Massachusetts Public Assistance Programs and other services administered by Defendant, who were required to provide their PII, directly or indirectly, to Defendant.

19.     As a condition of receiving services and/or benefits from the Massachusetts Public Assistance Programs, Defendant requires that plan members and/or beneficiaries, including

---

[8] https://www.umassmed.edu/about/ (last visited Aug. 28, 2023).
[9] The "Notice Letter".

Plaintiff and Class Members, entrust it with highly sensitive personal information.

20.     The information held by Defendant in its computer systems or shared with its vendors at the time of the Data Breach included the unencrypted PII of Plaintiff and Class Members.

21.     Upon information and belief, Defendant made promises and representations to the recipients of its services, including Plaintiff and Class Members, that the PII collected from them as a condition of utilizing public assistance programs would be kept safe, confidential, that the privacy of that information would be maintained, and that Defendant would delete any sensitive information after it was no longer required to maintain it.

22.     Indeed, Defendant's Privacy Statement provides that: "[w]e use computer safeguards, including multifactor authentication, to protect your information."[10]

23.     Plaintiff and Class Members provided their PII to Defendant, directly or indirectly, with the reasonable expectation and on the mutual understanding that Defendant would comply with its obligations to keep such information confidential and secure from unauthorized access.

24.     Plaintiff and the Class Members have taken reasonable steps to maintain the confidentiality of their PII. Plaintiff and Class Members relied on the sophistication of Defendant to keep their PII confidential and securely maintained, to use this information for necessary purposes only, and to make only authorized disclosures of this information. Plaintiff and Class Members value the confidentiality of their PII and demand security to safeguard their PII.

25.     Defendant had a duty to adopt reasonable measures to protect the PII of Plaintiff and Class Members from involuntary disclosure to third parties and to audit, monitor, and verify the integrity of its IT vendors' and affiliates' data security practices and systems. Defendant has a

---

[10] https://www.umassmed.edu/about/privacy-statement/ (last visited Aug. 28, 2023).

legal duty to keep patient's PII safe and confidential.

26.    Defendant had obligations created by FTC Act, contract, industry standards, and representations made to Plaintiff and Class Members, to keep their PII confidential and to protect it from unauthorized access and disclosure.

27.    Defendant derived a substantial economic benefit from collecting Plaintiff's and Class Members' PII. Without the required submission of PII, Defendant could not perform the services it provides.

28.    By obtaining, collecting, using, and deriving a benefit from Plaintiff's and Class Members' PII, Defendant assumed legal and equitable duties and knew or should have known that it was responsible for protecting Plaintiff's and Class Members' PII from disclosure.

**The Data Breach**

29.    On or about August 14, 2023 Defendant began sending Plaintiff and other Data Breach victims an untitled (the "Notice Letter"), informing them that:

**What Happened**

On June 1, 2023, UMass Chan learned that security flaw in MOVEit allowed unauthorized access to some of the files that were shared using this software. After learning of this security flaw, UMass Chan contacted law enforcement and launched an investigation.

Through our investigation, we learned that unauthorized parties used the security flaw in the MOVEit software to gain access to certain files that had been shared between May 27, 2023, and May 28, 2023.

**What Information Was Involved**

UMass Chan has identified the files that may have been subject to unauthorized acquisition as a result of the MOVEit security flaw. On July 27, 2023, UMass Chan determined that some of these files contained your name and your Social Security number, and Date of Birth.[11]

---

[11] Notice Letter.

30.     Defendant did not use reasonable security procedures and practices appropriate to the nature of the sensitive information they were maintaining for Plaintiff and Class Members, causing the exposure of PII, such as encrypting the information or deleting it when it is no longer needed. Moreover, Defendant failed to exercise due diligence in selecting its IT vendors or deciding with whom it would share sensitive PII.

31.     The attacker accessed and acquired files Defendant shared with a third party containing unencrypted PII of Plaintiff and Class Members, including their Social Security numbers and other sensitive information. Plaintiff's and Class Members' PII was accessed and stolen in the Data Breach.

32.     Plaintiff further believes her PII, and that of Class Members, was subsequently sold on the dark web following the Data Breach, as that is the *modus operandi* of cybercriminals that commit cyber-attacks of this type.

### Data Breaches Are Preventable

33.     Defendant could have prevented this Data Breach by, among other things, properly encrypting PII being shared with its vendors or otherwise ensuring that such PII was protected while in transit or accessible.

34.     Defendant did not use reasonable security procedures and practices appropriate to the nature of the sensitive information they were maintaining for Plaintiff and Class Members, causing the exposure of PII, such as encrypting the information or deleting it when it is no longer needed.

35.     The unencrypted PII of Class Members will end up for sale to identity thieves on the dark web, if it has not already, or it could simply fall into the hands of companies that will use the detailed PII for targeted marketing without the approval of Plaintiff and Class Members.

Unauthorized individuals can easily access the PII of Plaintiff and Class Members.

### *Defendant Acquires, Collects, And Stores Plaintiff's and Class Members' PII*

36.     As a condition to obtain services and/or benefits through Defendant, Plaintiff and Class Members were required to give their sensitive and confidential PII, directly or indirectly, to Defendant.

37.     Defendant retains and stores this information and derives a substantial economic benefit from the PII that they collect. But for the collection of Plaintiff's and Class Members' PII, Defendant would be unable to perform its services.

38.     By obtaining, collecting, and storing the PII of Plaintiff and Class Members, Defendant assumed legal and equitable duties and knew or should have known that they were responsible for protecting the PII from disclosure.

39.     Plaintiff and Class Members have taken reasonable steps to maintain the confidentiality of their PII and relied on Defendant to keep their PII confidential and maintained securely, to use this information for business purposes only, and to make only authorized disclosures of this information.

40.     Defendant could have prevented this Data Breach by properly securing and encrypting the files and file servers containing the PII of Plaintiff and Class Members or by exercising due diligence in selecting its IT vendors and properly auditing those vendor's security practices.

41.     Upon information and belief, Defendant made promises to Plaintiff and Class Members to maintain and protect their PII, demonstrating an understanding of the importance of securing PII.

42.     Indeed, Defendant's Privacy Statement provides that: "[w]e use computer

safeguards, including multifactor authentication, to protect your information."[12]

43.    Defendant's negligence in safeguarding the PII of Plaintiff and Class Members is exacerbated by the repeated warnings and alerts directed to protecting and securing sensitive data.

### Defendant Knew or Should Have Known of the Risk Because Healthcare Entities In Possession Of PII Are Particularly Suspectable To Cyber Attacks

44.    Defendant's data security obligations were particularly important given the substantial increase in cyber-attacks and/or data breaches targeting health care entities that collect and store PII, like Defendant, preceding the date of the breach.

45.    Data thieves regularly target companies like Defendant's due to the highly sensitive information that they custody. Defendant knew and understood that unprotected PII is valuable and highly sought after by criminal parties who seek to illegally monetize that PII through unauthorized access.

46.    In 2021, a record 1,862 data breaches occurred, resulting in approximately 293,927,708 sensitive records being exposed, a 68% increase from 2020.[13]

47.    In light of recent high profile cybersecurity incidents at other healthcare partner and provider companies, including American Medical Collection Agency (25 million plan members and/or beneficiaries, March 2019), University of Washington Medicine (974,000 plan members and/or beneficiaries, December 2018), Florida Orthopedic Institute (640,000 plan members and/or beneficiaries, July 2020), Wolverine Solutions Group (600,000 plan members and/or beneficiaries, September 2018), Oregon Department of Human Services (645,000 plan members and/or beneficiaries, March 2019), Elite Emergency Physicians (550,000 plan members

---

[12] https://www.umassmed.edu/about/privacy-statement/ (last visited Aug. 28, 2023).
[13] *See* 2021 Data Breach Annual Report (ITRC, Jan. 2022) (available at https://notified.idtheftcenter.org/s/), at 6.

and/or beneficiaries, June 2020), Magellan Health (365,000 plan members and/or beneficiaries, April 2020), and BJC Health System (286,876 plan members and/or beneficiaries, March 2020), Defendant knew or should have known that its electronic records would be targeted by cybercriminals

48.     In fact, according to the cybersecurity firm Mimecast, 90% of healthcare organizations experienced cyberattacks in 2019 alone.[14]

49.     As a custodian of PII, Defendant knew, or should have known, the importance of safeguarding the PII entrusted to it by Plaintiff and Class members, and of the foreseeable consequences if its data security systems were breached, including the significant costs imposed on Plaintiff and Class Members as a result of a breach.

50.     Indeed, cyberattacks have become so notorious that the Federal Bureau of Investigation ("FBI") and U.S. Secret Service have issued a warning to potential targets so they are aware of, and prepared for, a potential attack. As one report explained, "[e]ntities like smaller municipalities and hospitals are attractive to ransomware criminals . . . because they often have lesser IT defenses and a high incentive to regain access to their data quickly."[15]

51.     Despite the prevalence of public announcements of data breach and data security compromises, Defendant failed to take appropriate steps to protect the PII of Plaintiff and Class Members from being compromised.

52.     At all relevant times, Defendant knew, or reasonably should have known, of the

---

[14] *See* Maria Henriquez, Iowa City Hospital Suffers Phishing Attack, Security Magazine (Nov. 23, 2020), https://www.securitymagazine.com/articles/93988-iowa-city-hospital-suffers-phishing-attack (last visited on March 10, 2022).
[15] FBI, Secret Service Warn of Targeted, Law360 (Nov. 18, 2019), https://www.law360.com/articles/1220974/fbisecret-service-warn-of-targeted-ransomware (last visited Sep. 13, 2022).

importance of safeguarding the PII of Plaintiff and Class Members and of the foreseeable consequences that would occur if Defendant's data security system was breached, including, specifically, the significant costs that would be imposed on Plaintiff and Class Members as a result of a breach.

53.     Defendant was, or should have been, fully aware of the unique type and the significant volume of data on Defendant's server(s), amounting to over one hundred thousand individuals' detailed, PII, and, thus, the significant number of individuals who would be harmed by the exposure of the unencrypted data.

54.     Additionally, as companies became more dependent on computer systems to run their business,[16] *e.g*., working remotely as a result of the Covid-19 pandemic, and the Internet of Things ("IoT"), the danger posed by cybercriminals is magnified, thereby highlighting the need for adequate administrative, physical, and technical safeguards.[17]

55.     In the Notice Letter, Defendant offers to provide 5 years of credit monitoring and identity theft insurance services. This is wholly inadequate to compensate Plaintiff and Class Members as it fails to provide for the fact victims of data breaches and other unauthorized disclosures commonly face multiple years of ongoing identity theft, financial fraud, and it entirely fails to provide sufficient compensation for the unauthorized release and disclosure of Plaintiff and Class Members' PII. Moreover, once this service expires, Plaintiff and Class Members will be forced to pay out of pocket for necessary identity monitoring services.

56.     Defendant's offer of credit and identity monitoring establishes that Plaintiff's and

---

[16]https://www.federalreserve.gov/econres/notes/feds-notes/implications-of-cyber-risk-for-financial-stability-20220512.html
[17]     https://www.picussecurity.com/key-threats-and-cyber-risks-facing-financial-services-and-banking-firms-in-2022

Class Members' sensitive PII *was* in fact affected, accessed, compromised, and exfiltrated from Defendant's computer systems.

57.     The injuries to Plaintiff and Class Members were directly and proximately caused by Defendant's failure to implement or maintain adequate data security measures for the PII of Plaintiff and Class Members.

58.     The ramifications of Defendant's failure to keep secure the PII of Plaintiff and Class Members are long lasting and severe. Once PII is stolen—particularly Social Security numbers—fraudulent use of that information and damage to victims may continue for years.

59.     As an entity in possession of sensitive PII, Defendant knew, or should have known, the importance of safeguarding the PII entrusted to them by Plaintiff and Class Members and of the foreseeable consequences if its data security systems were breached. This includes the significant costs imposed on Plaintiff and Class Members as a result of a breach. Nevertheless, Defendant failed to take adequate cybersecurity measures to prevent the Data Breach.

## F.     *Value Of Personally Identifiable Information*

60.     The Federal Trade Commission ("FTC") defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority."[18] The FTC describes "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including, among other things, "[n]ame, Social Security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number."[19]

---

[18] 17 C.F.R. § 248.201 (2013).
[19] *Id.*

61.     The PII of individuals remains of high value to criminals, as evidenced by the prices they will pay through the dark web. Numerous sources cite dark web pricing for stolen identity credentials.[20]

62.     For example, PII can be sold at a price ranging from $40 to $200.[21] Criminals can also purchase access to entire company data breaches from $900 to $4,500.[22]

63.     Social Security numbers, which were compromised for some of the Class Members as alleged herein, for example, are among the worst kind of PII to have stolen because they may be put to a variety of fraudulent uses and are difficult for an individual to change. The Social Security Administration stresses that the loss of an individual's Social Security number, as is the case here, can lead to identity theft and extensive financial fraud:

> A dishonest person who has your Social Security number can use it to get other personal information about you. Identity thieves can use your number and your good credit to apply for more credit in your name. Then, they use the credit cards and don't pay the bills, it damages your credit. You may not find out that someone is using your number until you're turned down for credit, or you begin to get calls from unknown creditors demanding payment for items you never bought. Someone illegally using your Social Security number and assuming your identity can cause a lot of problems.[23]

64.     What's more, it is no easy task to change or cancel a stolen Social Security number. An individual cannot obtain a new Social Security number without significant paperwork and evidence of actual misuse. In other words, preventive action to defend against the

---

[20] *Your personal data is for sale on the dark web. Here's how much it costs,* Digital Trends, Oct. 16, 2019, *available at*: https://www.digitaltrends.com/computing/personal-data-sold-on-the-dark-web-how-much-it-costs/ (last visited Oct. 17, 2022).

[21] *Here's How Much Your Personal Information Is Selling for on the Dark Web*, Experian, Dec. 6, 2017, *available at*: https://www.experian.com/blogs/ask-experian/heres-how-much-your-personal-information-is-selling-for-on-the-dark-web/ (last visited Oct. 17, 2022).

[22] *In the Dark*, VPNOverview, 2019, *available at*: https://vpnoverview.com/privacy/anonymous-browsing/in-the-dark/ (last visited Oct. 217, 2022).

[23] Social Security Administration, *Identity Theft and Your Social Security Number*, *available at*: https://www.ssa.gov/pubs/EN-05-10064.pdf (last visited Oct. 17, 2022).

possibility of misuse of a Social Security number is not permitted; an individual must show evidence of actual, ongoing fraud activity to obtain a new number.

65.    Even then, a new Social Security number may not be effective. According to Julie Ferguson of the Identity Theft Resource Center, "[t]he credit bureaus and banks are able to link the new number very quickly to the old number, so all of that old bad information is quickly inherited into the new Social Security number."[24]

66.    Among other forms of fraud, identity thieves may obtain driver's licenses, government benefits, medical services, and housing or even give false information to police.

67.    Based on the foregoing, the information compromised in the Data Breach is significantly more valuable than the loss of, for example, credit card information in a retailer data breach because, there, victims can cancel or close credit and debit card accounts. The information compromised in this Data Breach is impossible to "close" and difficult, if not impossible, to change—names and Social Security numbers.

68.    This data demands a much higher price on the black market. Martin Walter, senior director at cybersecurity firm RedSeal, explained, "Compared to credit card information, personally identifiable information . . . [is] worth more than 10x on the black market."[25]

69.    The fraudulent activity resulting from the Data Breach may not come to light for years. There may be a time lag between when harm occurs versus when it is discovered, and also between when PII is stolen and when it is used. According to the U.S. Government Accountability

---

[24] Bryan Naylor, *Victims of Social Security Number Theft Find It's Hard to Bounce Back*, NPR (Feb. 9, 2015), *available at*: http://www.npr.org/2015/02/09/384875839/data-stolen-by-anthem-s-hackers-has-millionsworrying-about-identity-theft (last visited Oct. 17, 2022).

[25] Tim Greene, *Anthem Hack: Personal Data Stolen Sells for 10x Price of Stolen Credit Card Numbers*, IT World, (Feb. 6, 2015), *available at*: https://www.networkworld.com/article/2880366/anthem-hack-personal-data-stolen-sells-for-10x-price-of-stolen-credit-card-numbers.html (last visited Oct. 17, 2022).

Office ("GAO"), which conducted a study regarding data breaches:

> [L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.[26]

### Defendant Failed to Comply with FTC Guidelines

70.     The Federal Trade Commission ("FTC") has promulgated numerous guides for businesses which highlight the importance of implementing reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision making. Indeed, the FTC has concluded that a company's failure to maintain reasonable and appropriate data security for plan members and/or beneficiaries' sensitive personal information is an "unfair practice" in violation of Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45. *See, e.g., FTC v. Wyndham Worldwide Corp.,* 799 F.3d 236 (3d Cir. 2015).

71.     In October 2016, the FTC updated its publication, Protecting Personal Information: A Guide for Business, which established cybersecurity guidelines for businesses. The guidelines note that businesses should protect the personal patient information that they keep, properly dispose of personal information that is no longer needed, encrypt information stored on computer networks, understand their network's vulnerabilities, and implement policies to correct any security problems. The guidelines also recommend that businesses use an intrusion detection system to expose a breach as soon as it occurs, monitor all incoming traffic for activity indicating someone is attempting to hack into the system, watch for large amounts of data being transmitted from the system, and have a response plan ready in the event of a breach.

---

[26] *Report to Congressional Requesters*, GAO, at 29 (June 2007), *available at:* https://www.gao.gov/assets/gao-07-737.pdf (last visited Oct. 17, 2022).

72.    The FTC further recommends that companies not maintain PII longer than is needed for authorization of a transaction, limit access to sensitive data, require complex passwords to be used on networks, use industry-tested methods for security, monitor the network for suspicious activity, and verify that third-party service providers have implemented reasonable security measures.

73.    The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect patient data by treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential patient data as an unfair act or practice prohibited by the FTCA. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

74.    These FTC enforcement actions include actions against healthcare entities, like Defendant. *See, e.g., In the Matter of LabMd, Inc., A Corp*, 2016-2 Trade Cas. (Henry Ford) ¶ 79708, 2016 WL 4128215, at *32 (MSNET July 28, 2016) ("[T]he Commission concludes that LabMD's data security practices were unreasonable and constitute an unfair act or practice in violation of Section 5 of the FTC Act.").

75.    As evidenced by the Data Breach, Defendant failed to properly implement basic data security practices and failed to audit, monitor, or ensure the integrity of its vendor's data security practices. Defendant's failure to employ reasonable and appropriate measures to protect against unauthorized access to Plaintiff's and Class Members' PII constitutes an unfair act or practice prohibited by Section 5 of the FTCA.

76.    Defendant was at all times fully aware of its obligation to protect the PII of the Massachusetts Public Assistance Programs' plan members and/or beneficiaries in its network yet failed to comply with such obligations. Defendant was also aware of the significant repercussions

that would result from its failure to do so.

### *Defendant Failed to Comply with Industry Standards*

77.     As noted above, experts studying cybersecurity routinely identify healthcare entities as being particularly vulnerable to cyberattacks because of the value of the PII which they collect and maintain.

78.     Some industry best practices that should be implemented by healthcare entities dealing with sensitive PII, like Defendant, include but are not limited to: educating all employees, strong password requirements, multilayer security including firewalls, anti-virus and anti-malware software, encryption, multi-factor authentication, backing up data, and limiting which employees can access sensitive data. As evidenced by the Data Breach, Defendant failed to follow some or all of these industry best practices.

79.     Defendant failed to meet the minimum standards of any of the following frameworks: the NIST Cybersecurity Framework Version 1.1 (including without limitation PR.AC-1, PR.AC-3, PR.AC-4, PR.AC-5, PR.AC-6, PR.AC-7, PR.AT-1, PR.DS-1, PR.DS-5, PR.PT-1, PR.PT-3, DE.CM-1, DE.CM-4, DE.CM-7, DE.CM-8, and RS.CO-2), and the Center for Internet Security's Critical Security Controls (CIS CSC), which are all established standards in reasonable cybersecurity readiness.

80.     Defendant failed to comply with these accepted standards in the healthcaer industry, thereby permitting the Data Breach to occur.

### *Defendant Breached its Duty to Safeguard Plaintiff's and Class Members' PII*

81.     In addition to its obligations under federal and state laws, Defendant owed a duty to Plaintiff and Class Members to exercise reasonable care in sharing, obtaining, retaining, securing, safeguarding, deleting, and protecting the PII in its possession from being compromised,

lost, stolen, accessed, and misused by unauthorized persons. Defendant owed a duty to Plaintiff and Class Members to provide reasonable security, including consistency with industry standards and requirements, and to ensure that its computer systems, networks, and protocols adequately protected the PII of Class Members

82.    Defendant breached its obligations to Plaintiff and Class Members and/or was otherwise negligent and reckless because it failed to properly maintain and safeguard its computer systems and data and failed to audit, monitor, or ensure the integrity of its vendor's data security practices. Defendant's unlawful conduct includes, but is not limited to, the following acts and/or omissions:

   a.    Failing to maintain an adequate data security system that would reduce the risk of data breaches and cyberattacks;

   b.    Failing to adequately protect plan members and/or beneficiaries' PII;

   c.    Failing to properly monitor its own data security systems for existing intrusions;

   d.    Failing to audit, monitor, or ensure the integrity of its vendor's data security practices;

   e.    Failing to sufficiently train its employees and vendors regarding the proper handling of its plan members and/or beneficiaries PII;

   f.    Failing to fully comply with FTC guidelines for cybersecurity in violation of the FTCA;

   g.    Failing to adhere to industry standards for cybersecurity as discussed above; and

   h.    Otherwise breaching its duties and obligations to protect Plaintiff's and Class Members' PII.

83.    Defendant negligently and unlawfully failed to safeguard Plaintiff's and Class

Members' PII by allowing cyberthieves to access its computer network and systems which contained unsecured and unencrypted PII.

84.     Had Defendant remedied the deficiencies in its information storage and security systems or those of its vendors and affiliates, followed industry guidelines, and adopted security measures recommended by experts in the field, it could have prevented intrusion into its information storage and security systems and, ultimately, the theft of Plaintiff's and Class Members' confidential PII.

### *Common Injuries & Damages*

85.     As a result of Defendant's ineffective and inadequate data security practices, the Data Breach, and the foreseeable consequences of PII ending up in the possession of criminals, the risk of identity theft to the Plaintiff and Class Members has materialized and is imminent, and Plaintiff and Class Members have all sustained actual injuries and damages, including: (a) invasion of privacy; (b) loss of time and loss of productivity incurred mitigating the materialized risk and imminent threat of identity theft risk; (c) the loss of benefit of the bargain (price premium damages); (d) diminution of value of their PII; I invasion of privacy; and (f) the continued risk to their PII, which remains in the possession of Defendant, and which is subject to further breaches, so long as Defendant fails to undertake appropriate and adequate measures to protect Plaintiff's and Class Members' PII.

### *The Data Breach Increases Victims' Risk Of Identity Theft*

86.     Plaintiff and Class Members are at a heightened risk of identity theft for years to come.

87.     The unencrypted PII of Class Members will end up for sale on the dark web because that is the *modus operandi* of hackers. In addition, unencrypted PII may fall into the hands

of companies that will use the detailed PII for targeted marketing without the approval of Plaintiff and Class Members. Unauthorized individuals can easily access the PII of Plaintiff and Class Members.

88.     The link between a data breach and the risk of identity theft is simple and well established. Criminals acquire and steal PII to monetize the information. Criminals monetize the data by selling the stolen information on the black market to other criminals who then utilize the information to commit a variety of identity theft related crimes discussed below.

89.     Because a person's identity is akin to a puzzle with multiple data points, the more accurate pieces of data an identity thief obtains about a person, the easier it is for the thief to take on the victim's identity--or track the victim to attempt other hacking crimes against the individual to obtain more data to perfect a crime.

90.     For example, armed with just a name and date of birth, a data thief can utilize a hacking technique referred to as "social engineering" to obtain even more information about a victim's identity, such as a person's login credentials or Social Security number. Social engineering is a form of hacking whereby a data thief uses previously acquired information to manipulate and trick individuals into disclosing additional confidential or personal information through means such as spam phone calls and text messages or phishing emails. Data Breaches can be the starting point for these additional targeted attacks on the victim.

91.     One such example of criminals piecing together bits and pieces of compromised PII for profit is the development of "Fullz" packages.[27]

---

[27] "Fullz" is fraudster speak for data that includes the information of the victim, including, but not limited to, the name, address, credit card information, social security number, date of birth, and more. As a rule of thumb, the more information you have on a victim, the more money that can be made off of those credentials. Fullz are usually pricier than standard credit card credentials, commanding up to $100 per record (or more) on the dark web. Fullz can be cashed out (turning

92.     With "Fullz" packages, cyber-criminals can cross-reference two sources of PII to marry unregulated data available elsewhere to criminally stolen data with an astonishingly complete scope and degree of accuracy in order to assemble complete dossiers on individuals.

93.     The development of "Fullz" packages means here that the stolen PII from the Data Breach can easily be used to link and identify it to Plaintiffs' and Class Members' phone numbers, email addresses, and other unregulated sources and identifiers. In other words, even if certain information such as emails, phone numbers, or credit card numbers may not be included in the PII that was exfiltrated in the Data Breach, criminals may still easily create a Fullz package and sell it at a higher price to unscrupulous operators and criminals (such as illegal and scam telemarketers) over and over.

94.     The existence and prevalence of "Fullz" packages means that the PII stolen from the data breach can easily be linked to the unregulated data (like driver's license numbers) of Plaintiff and the other Class Members.

95.     Thus, even if certain information (such as driver's license numbers) was not stolen in the data breach, criminals can still easily create a comprehensive "Fullz" package.

96.     Then, this comprehensive dossier can be sold—and then resold in perpetuity—to crooked operators and other criminals (like illegal and scam telemarketers).

***Loss Of Time To Mitigate Risk Of Identity Theft And Fraud***

---

credentials into money) in various ways, including performing bank transactions over the phone with the required authentication details in-hand. Even "dead Fullz," which are Fullz credentials associated with credit cards that are no longer valid, can still be used for numerous purposes, including tax refund scams, ordering credit cards on behalf of the victim, or opening a "mule account" (an account that will accept a fraudulent money transfer from a compromised account) without the victim's knowledge. *See, e.g.*, Brian Krebs, *Medical Records for Sale in Underground Stolen From Texas Life Insurance Firm*, Krebs on Security (Sep. 18, 2014), https://krebsonsecuritv.com/2014/09/medical-records-for-sale-in-underground-stolen-from-texas-life-insurance-](https://krebsonsecuritv.com/2014/09/medical-records-for-sale-in-underground-stolen-from-texas-life-insurance-finn/ (last visited on May 26, 2023).

97.      As a result of the recognized risk of identity theft, when a Data Breach occurs, and an individual is notified by a company that their PII was compromised, as in this Data Breach, the reasonable person is expected to take steps and spend time to address the dangerous situation, learn about the breach, and otherwise mitigate the risk of becoming a victim of identity theft of fraud. Failure to spend time taking steps to review accounts or credit reports could expose the individual to greater financial harm – yet, the resource and asset of time has been lost.

98.      Thus, due to the actual and imminent risk of identity theft, Plaintiff and Class Members must, as Defendant's Notice Letter encourages, monitor their financial accounts for many years to mitigate the risk of identity theft.

99.      Plaintiff and Class Members have spent, and will spend additional time in the future, on a variety of prudent actions to remedy the harms they have or may experience as a result of the Data Breach, such as researching and verifying the legitimacy of the Data Breach upon receiving the Notice Letter.

100.     These efforts are consistent with the U.S. Government Accountability Office that released a report in 2007 regarding data breaches ("GAO Report") in which it noted that victims of identity theft will face "substantial costs and time to repair the damage to their good name and credit record."[28]

101.     These efforts are also consistent with the steps that FTC recommends that data breach victims take several steps to protect their personal and financial information after a data breach, including: contacting one of the credit bureaus to place a fraud alert (consider an extended

---

[28] *See* United States Government Accountability Office, GAO-07-737, Personal Information: Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown (June 2007), https://www.gao.gov/new.items/d07737.pdf.

fraud alert that lasts for seven years if someone steals their identity), reviewing their credit reports, contacting companies to remove fraudulent charges from their accounts, placing a credit freeze on their credit, and correcting their credit reports.[29]

102.    And for those Class Members who experience actual identity theft and fraud, the United States Government Accountability Office released a report in 2007 regarding data breaches ("GAO Report") in which it noted that victims of identity theft will face "substantial costs and time to repair the damage to their good name and credit record."[30]

*Diminution Value Of PII*

103.    PII is a valuable property right.[31] Its value is axiomatic, considering the value of Big Data in corporate America and the consequences of cyber thefts include heavy prison sentences. Even this obvious risk to reward analysis illustrates beyond doubt that PII has considerable market value.

104.    An active and robust legitimate marketplace for PII exists. In 2019, the data brokering industry was worth roughly $200 billion.[32]

105.    In fact, the data marketplace is so sophisticated that consumers can actually sell their non-public information directly to a data broker who in turn aggregates the information and

---

[29] *See* Federal Trade Commission, *Identity Theft.gov*, https://www.identitytheft.gov/Steps (last visited July 7, 2022).

[30] *See* "Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown," p. 2, U.S. Government Accountability Office, June 2007, https://www.gao.gov/new.items/d07737.pdf (last visited Sep. 13, 2022) ("GAO Report").

[31] *See, e.g.,* Randall T. Soma, et al, Corporate Privacy Trend: The "Value" of Personally Identifiable Information ("PII") Equals the "Value" of Financial Assets, 15 Rich. J.L. & Tech. 11, at *3-4 (2009) ("PII, which companies obtain at little cost, has quantifiable value that is rapidly reaching a level comparable to the value of traditional financial assets.") (citations omitted).

[32] https://www.latimes.com/business/story/2019-11-05/column-data-brokers

provides it to marketers or app developers.[33],[34]

106.    Consumers who agree to provide their web browsing history to the Nielsen Corporation can receive up to $50.00 a year.[35]

107.    Conversely sensitive PII can sell for as much as $363 per record on the dark web according to the Infosec Institute.[36]

108.    As a result of the Data Breach, Plaintiff's and Class Members' PII, which has an inherent market value in both legitimate and dark markets, has been damaged and diminished by its compromise and unauthorized release. However, this transfer of value occurred without any consideration paid to Plaintiff or Class Members for their property, resulting in an economic loss. Moreover, the PII is now readily available, and the rarity of the data has been lost, thereby causing additional loss of value.

109.    Based on the foregoing, the information compromised in the Data Breach is significantly more valuable than the loss of, for example, credit card information in a retailer data breach because, there, victims can cancel or close credit and debit card accounts. The information compromised in this Data Breach is impossible to "close" and difficult, if not impossible, to change, e.g., names and Social Security numbers.

110.    Among other forms of fraud, identity thieves may obtain driver's licenses, government benefits, medical services, and housing or even give false information to police.

111.    The fraudulent activity resulting from the Data Breach may not come to light for

---

[33] https://datacoup.com/
[34] https://digi.me/what-is-digime/
[35] Nielsen Computer & Mobile Panel, *Frequently Asked Questions, available at* https://computermobilepanel.nielsen.com/ui/US/en/faqen.html
[36] *See* Ashiq Ja, *Hackers Selling Healthcare Data in the Black Market*, InfoSec (July 27, 2015), https://resources.infosecinstitute.com/topic/hackers-selling-healthcare-data-in-the-black-market/ (last visited Sep. 13, 2022).

years.

112.    At all relevant times, Defendant knew, or reasonably should have known, of the importance of safeguarding the PII of Plaintiff and Class Members, and of the foreseeable consequences that would occur if Defendant's data security system was breached, including, specifically, the significant costs that would be imposed on Plaintiff and Class Members as a result of a breach.

113.    Defendant was, or should have been, fully aware of the unique type and the significant volume of data on Defendant's network, amounting to over one hundred thousand individuals' detailed personal information, upon information and belief, and thus, the significant number of individuals who would be harmed by the exposure of the unencrypted data.

114.    The injuries to Plaintiff and Class Members were directly and proximately caused by Defendant's failure to implement or maintain adequate data security measures for the PII of Plaintiff and Class Members.

### *Future Cost of Credit and Identity Theft Monitoring is Reasonable and Necessary*

115.    Given the type of targeted attack in this case and sophisticated criminal activity, the type of PII involved, and the volume of data obtained in the Data Breach, there is a strong probability that entire batches of stolen information have been placed, or will be placed, on the black market/dark web for sale and purchase by criminals intending to utilize the PII for identity theft crimes –*e.g.,* opening bank accounts in the victims' names to make purchases or to launder money; file false tax returns; take out loans or lines of credit; or file false unemployment claims.

116.    Such fraud may go undetected until debt collection calls commence months, or even years, later. An individual may not know that his or her Social Security Number was used to file for unemployment benefits until law enforcement notifies the individual's employer of the

suspected fraud. Fraudulent tax returns are typically discovered only when an individual's authentic tax return is rejected.

117.     Consequently, Plaintiff and Class Members are at a present and continuous risk of fraud and identity theft for many years into the future.

118.     The retail cost of credit monitoring and identity theft monitoring can cost around $200 a year per Class Member. This is reasonable and necessary cost to monitor to protect Class Members from the risk of identity theft that arose from Defendant's Data Breach. This is a future cost for a minimum of five years that Plaintiff and Class Members would not need to bear but for Defendant's failure to safeguard their PII.

### Plaintiff Burak's Experience

119.     Plaintiff Katherine Burak is a current recipient of services administered by Defendant.

120.     At the time of the Data Breach—approximately May 27, 2023, through May 28, 2023—Defendant retained Plaintiff's PII, including her name, Social Security number, and date of birth, in its system and shared it with its IT vendors.

121.     Plaintiff Burak is very careful about sharing her sensitive PII. Plaintiff stores any documents containing her PII in a safe and secure location. She has never knowingly transmitted unencrypted sensitive PII over the internet or any other unsecured source. Plaintiff would not have entrusted her PII to Defendant had she known of Defendant's lax data security policies.

122.     Plaintiff Katherine Burak received the Notice Letter, by U.S. mail, directly from Defendant, dated August 14, 2023. According to the Notice Letter, Plaintiff's PII was improperly accessed and obtained by unauthorized third parties, including her name; date of birth; and Social Security number.

123.     As a result of the Data Breach, and at the direction of Defendant's Notice Letter, Plaintiff made reasonable efforts to mitigate the impact of the Data Breach, including researching and verifying the legitimacy of the Data Breach upon receiving the Notice Letter–valuable time Plaintiff otherwise would have spent on other activities, including but not limited to work and/or recreation. This time has been lost forever and cannot be recaptured.

124.     As a result of the Data Breach, Plaintiff has experienced the attempted misuse of her PII. Following the Data Breach, Plaintiff has experienced an increase in spam calls, texts, and/or emails, which, upon information and belief, was caused by the Data Breach.

125.     Plaintiff suffered actual injury from having her PII compromised as a result of the Data Breach including, but not limited to: (i) invasion of privacy; (ii) lost or diminished value of PII; (iii) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; and (iv) the continued and certainly increased risk to their PII, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the PII.

126.     The Data Breach has caused Plaintiff to suffer fear, anxiety, and stress, which has been compounded by the fact that Defendant has still not fully informed him of key details about the Data Breach's occurrence.

127.     As a result of the Data Breach, Plaintiff anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach.

128.     As a result of the Data Breach, Plaintiff is at a present risk and will continue to be at increased risk of identity theft and fraud for years to come.

129.    Plaintiff Katherine Burak has a continuing interest in ensuring that her PII, which, upon information and belief, remains backed up in Defendant's possession, is protected and safeguarded from future breaches.

## V.  CLASS ACTION ALLEGATIONS

130.    Plaintiff brings this action individually and on behalf of all other persons similarly situated, pursuant to Federal Rule of Civil Procedure 23(a), 23(b)(1), 23(b)(2), and 23(b)(3).

131.    Specifically, Plaintiff proposes the following Nationwide Class, subject to amendment as appropriate:

**Nationwide Class**

All individuals in the United States whose PII was impacted as a result of the Data Breach (the "Class").

132.    Excluded from the Class are Defendant and its parents or subsidiaries, any entities in which it has a controlling interest, as well as its officers, directors, affiliates, legal representatives, heirs, predecessors, successors, and assigns. Also excluded is any Judge to whom this case is assigned as well as their judicial staff and immediate family members.

133.    Plaintiff reserves the right to modify or amend the definition of the proposed Nationwide Class, as well as add subclasses, before the Court determines whether certification is appropriate.

134.    The proposed Class meets the criteria for certification under Fed. R. Civ. P. 23(a), (b)(2), and (b)(3).

135.    <u>Numerosity</u>. The Class Members are so numerous that joinder of all members is impracticable. Although the precise number of Class Members is unknown to Plaintiff, according to the report submitted to the Department of Health and Human Services, approximately 134,0000

persons were impacted in the Data Breach, satisfying numerosity.[37]

136.  <u>Commonality</u>. There are questions of law and fact common to the Class which predominate over any questions affecting only individual Class Members. These common questions of law and fact include, without limitation:

    a.  Whether Defendant engaged in the conduct alleged herein;

    b.  Whether Defendant's conduct violated the FTCA;

    c.  When Defendant learned of the Data Breach;

    d.  Whether Defendant's response to the Data Breach was adequate;

    e.  Whether Defendant unlawfully lost or disclosed Plaintiff's and Class Members' PII;

    f.  Whether Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the PII compromised in the Data Breach;

    g.  Whether Defendant's data security systems prior to and during the Data Breach complied with applicable data security laws and regulations;

    h.  Whether Defendant's data security systems prior to and during the Data Breach were consistent with industry standards;

    i.  Whether Defendant owed a duty to Class Members to safeguard their PII;

    j.  Whether Defendant breached its duty to Class Members to safeguard their PII;

    k.  Whether hackers obtained Class Members' PII via the Data Breach;

    l.  Whether Defendant had a legal duty to provide timely and accurate notice of the Data Breach to Plaintiff and the Class Members;

---

[37] https://ocrportal.hhs.gov/ocr/breach/breach_report.jsf (last visited Aug. 28, 2023).

m.   Whether Defendant breached its duty to provide timely and accurate notice of the Data Breach to Plaintiff and Class Members;

n.   Whether Defendant knew or should have known that its data security systems and monitoring processes were deficient;

o.   What damages Plaintiff and Class Members suffered as a result of Defendant's misconduct;

p.   Whether Defendant's conduct was negligent;

q.   Whether Defendant was unjustly enriched;

r.   Whether Plaintiff and Class Members are entitled to actual and/or statutory damages;

s.   Whether Plaintiff and Class Members are entitled to additional credit or identity monitoring and monetary relief; and

t.   Whether Plaintiff and Class Members are entitled to equitable relief, including injunctive relief, restitution, disgorgement, and/or the establishment of a constructive trust.

137.   <u>Typicality.</u> Plaintiff's claims are typical of those of other Class Members because Plaintiff's PII, like that of every other Class Member, was compromised in the Data Breach. Plaintiff's claims are typical of those of the other Class Members because, inter alia, all Class Members were injured through the common misconduct of Defendant. Plaintiff is advancing the same claims and legal theories on behalf of herself and all other Class Members, and there are no defenses that are unique to Plaintiff. The claims of Plaintiff and those of Class Members arise from the same operative facts and are based on the same legal theories.

138.   <u>Adequacy of Representation.</u> Plaintiff will fairly and adequately represent and

protect the interests of Class Members. Plaintiff's counsel is competent and experienced in litigating class actions, including data privacy litigation of this kind.

139.    <u>Predominance</u>. Defendant has engaged in a common course of conduct toward Plaintiff and Class Members in that all of Plaintiff's and Class Members' data was stored on the same computer systems and unlawfully accessed and exfiltrated in the same way. The common issues arising from Defendant's conduct affecting Class Members set out above predominate over any individualized issues. Adjudication of these common issues in a single action has important and desirable advantages of judicial economy.

140.    <u>Superiority</u>. A Class action is superior to other available methods for the fair and efficient adjudication of this controversy and no unusual difficulties are likely to be encountered in the management of this class action. Class treatment of common questions of law and fact is superior to multiple individual actions or piecemeal litigation. Absent a Class action, most Class Members would likely find that the cost of litigating their individual claims is prohibitively high and would therefore have no effective remedy. The prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudications with respect to individual Class Members, which would establish incompatible standards of conduct for Defendant. In contrast, conducting this action as a class action presents far fewer management difficulties, conserves judicial resources and the parties' resources, and protects the rights of each Class Member.

141.    Class certification is also appropriate under Fed. R. Civ. P. 23(b)(2). Defendant has acted and/or refused to act on grounds generally applicable to the Class such that final injunctive relief and/or corresponding declaratory relief is appropriate as to the Class as a whole.

142.    Finally, all members of the proposed Class are readily ascertainable. Defendant

has access to the names and addresses and/or email addresses of Class Members affected by the Data Breach. Class Members have already been preliminarily identified and sent Notice of the Data Breach by Defendant.

## VI.   CLAIMS FOR RELIEF

### COUNT I
### Negligence
### (On Behalf Of Plaintiff And The Class)

143.    Plaintiff restates and realleges all of the allegations in paragraphs 1-142 as if fully set forth herein.

144.    Defendant requires the Massachusetts Public Assistance Programs plan members and/or beneficiaries in its network, including Plaintiff and Class Members, to submit non-public PII in the ordinary course of providing its services.

145.    Defendant gathered and stored the PII of Plaintiff and Class Members as part of its business of soliciting its services to its clients, which solicitations and services affect commerce.

146.    Plaintiff and Class Members entrusted Defendant with their PII, directly or indirectly, with the understanding that Defendant would safeguard their information.

147.    Defendant had full knowledge of the sensitivity of the PII and the types of harm that Plaintiff and Class Members could and would suffer if the PII were wrongfully disclosed.

148.    By assuming the responsibility to collect and store this data, and in fact doing so, and sharing it and using it for commercial gain, Defendant had a duty of care to use reasonable means to secure and safeguard their computer property—and Class Members' PII held within it—to prevent disclosure of the information, and to safeguard the information from theft. Defendant's duty included a responsibility to implement processes by which they could detect a

33

breach of its security systems in a reasonably expeditious period of time and to give prompt notice to those affected in the case of a data breach.

149.    Defendant had a duty to employ reasonable security measures under Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45, which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair practice of failing to use reasonable measures to protect confidential data.

150.    Defendant owed a duty of care to Plaintiff and Class Members to provide data security consistent with industry standards and other requirements discussed herein, and to ensure that its systems and networks, and the personnel responsible for them, adequately protected the PII.

151.    Defendant's duty of care to use reasonable security measures arose as a result of the special relationship that existed between Defendant and the plan members and/or beneficiaries in its network. That special relationship arose because Plaintiff and the Class entrusted Defendant with their confidential PII, a necessary part of receiving assistance and/or benefits through Massachusetts Public Assistance Programs.

152.    Defendant's duty to use reasonable care in protecting confidential data arose not only as a result of the statutes and regulations described above, but also because Defendant is bound by industry standards to protect confidential PII.

153.    Defendant was subject to an "independent duty," untethered to any contract between Defendant and Plaintiff or the Class.

154.    Defendant also had a duty to exercise appropriate clearinghouse practices to remove former plan members and/or beneficiaries' PII it was no longer required to retain pursuant to regulations.

155.    Moreover, Defendant had a duty to promptly and adequately notify Plaintiff and the Class of the Data Breach.

156.    Defendant had and continues to have a duty to adequately disclose that the PII of Plaintiff and the Class within Defendant's possession might have been compromised, how it was compromised, and precisely the types of data that were compromised and when. Such notice was necessary to allow Plaintiff and the Class to take steps to prevent, mitigate, and repair any identity theft and the fraudulent use of their PII by third parties.

157.    Defendant breached its duties, pursuant to the FTC Act and other applicable standards, and thus were negligent, by failing to use reasonable measures to protect Class Members' PII. The specific negligent acts and omissions committed by Defendant include, but are not limited to, the following:

    a.  Failing to adopt, implement, and maintain adequate security measures to safeguard Class Members' PII;

    b.  Failing to adequately monitor the security of their networks and systems;

    c.  Failing to adequately monitor the security of their IT vendors' and affiliates' networks and systems to ensure they enacted reasonable data security safeguards;

    d.  Allowing unauthorized access to Class Members' PII;

    e.  Failing to detect in a timely manner that Class Members' PII had been compromised;

    f.  Failing to remove former plan members and/or beneficiaries' PII it was no longer required to retain pursuant to regulations,

    g.  Failing to timely and adequately notify Class Members about the Data Breach's occurrence and scope, so that they could take appropriate steps to mitigate the

potential for identity theft and other damages; and

    h.   Failing to secure its stand-alone personal computers, such as the reception desk computers, even after discovery of the data breach.

158.    Defendant violated Section 5 of the FTC Act by failing to use reasonable measures to protect PII and not complying with applicable industry standards, as described in detail herein. Defendant's conduct was particularly unreasonable given the nature and amount of PII it obtained and stored and the foreseeable consequences of the immense damages that would result to Plaintiff and the Class.

159.    Plaintiff and the Class are within the class of persons that the FTC Act intended to protect.

160.    The harm that occurred as a result of the Data Breach is the type of harm that the FTC Act intended to guard against.

161.    Defendant's violation of Section 5 of the FTC Act constitutes negligence.

162.    The FTC has pursued enforcement actions against businesses, which, as a result of their failure to employ reasonable data security measures and avoid unfair and deceptive practices, caused the same harm as that suffered by Plaintiff and the Class.

163.    A breach of security, unauthorized access, and resulting injury to Plaintiff and the Class was reasonably foreseeable, particularly in light of Defendant's inadequate security practices.

164.    It was foreseeable that Defendant's failure to use reasonable measures to protect Class Members' PII would result in injury to Class Members. Further, the breach of security was reasonably foreseeable given the known high frequency of cyberattacks and data breaches in the healthcare industry.

165.    Defendant has full knowledge of the sensitivity of the PII and the types of harm that Plaintiff and the Class could and would suffer if the PII were wrongfully disclosed.

166.    Plaintiff and the Class were the foreseeable and probable victims of any inadequate security practices and procedures. Defendant knew or should have known of the inherent risks in collecting and storing the PII of Plaintiff and the Class, the critical importance of providing adequate security of that PII, and the necessity for encrypting PII stored on Defendant's systems.

167.    It was therefore foreseeable that the failure to adequately safeguard Class Members' PII would result in one or more types of injuries to Class Members.

168.    Plaintiff and the Class had no ability to protect their PII that was in, and possibly remains in, Defendant's possession.

169.    Defendant was in a position to protect against the harm suffered by Plaintiff and the Class as a result of the Data Breach.

170.    Defendant's duty extended to protecting Plaintiff and the Class from the risk of foreseeable criminal conduct of third parties, which has been recognized in situations where the actor's own conduct or misconduct exposes another to the risk or defeats protections put in place to guard against the risk, or where the parties are in a special relationship. *See* Restatement (Second) of Torts § 302B. Numerous courts and legislatures have also recognized the existence of a specific duty to reasonably safeguard personal information.

171.    Defendant has admitted that the PII of Plaintiff and the Class was wrongfully lost and disclosed to unauthorized third persons as a result of the Data Breach.

172.    But for Defendant's wrongful and negligent breach of duties owed to Plaintiff and the Class, the PII of Plaintiff and the Class would not have been compromised.

173.    There is a close causal connection between Defendant's failure to implement security measures to protect the PII of Plaintiff and the Class and the harm, or risk of imminent harm, suffered by Plaintiff and the Class. The PII of Plaintiff and the Class was lost and accessed as the proximate result of Defendant's failure to exercise reasonable care in safeguarding such PII by adopting, implementing, and maintaining appropriate security measures.

174.    As a direct and proximate result of Defendant's negligence, Plaintiff and the Class have suffered and will suffer injury, including but not limited to: (i) invasion of privacy; (ii) lost or diminished value of PII; (iii) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (iv) an increase in spam calls, texts, and/or emails; and (v) the continued and certainly increased risk to their PII, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the PII.

175.    As a direct and proximate result of Defendant's negligence, Plaintiff and the Class have suffered and will continue to suffer other forms of injury and/or harm, including, but not limited to, anxiety, emotional distress, loss of privacy, and other economic and non-economic losses.

176.    Additionally, as a direct and proximate result of Defendant's negligence, Plaintiff and the Class have suffered and will suffer the continued risks of exposure of their PII, which remain in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the PII in its continued possession.

177.    Plaintiff and Class Members are entitled to compensatory and consequential

damages suffered as a result of the Data Breach.

178.     Defendant's negligent conduct is ongoing, in that it still holds the PII of Plaintiff and Class Members in an unsafe and insecure manner.

179.     Plaintiff and Class Members are also entitled to injunctive relief requiring Defendant to (i) strengthen its data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) continue to provide adequate credit monitoring to all Class Members.

**COUNT II**
**Breach of Third-Party Beneficiary Contract**
**(On Behalf Of Plaintiff And The Class)**

180.     Plaintiff restates and realleges all of the allegations in paragraphs 1-142 as if fully set forth herein.

181.     Defendant entered into written contracts, including HIPAA Business Associate Agreements, with its clients, including the Massachusetts Public Assistance Programs, to provide services.

182.     In exchange, Defendant agreed, in part, to implement adequate security measures to safeguard the PII of Plaintiff and the Class and to timely and adequately notify them of the Data Breach.

183.     These contracts were made expressly for the benefit of Plaintiff and the Class, as Plaintiff and Class Members were the intended third-party beneficiaries of the contracts entered into between Defendant and the Massachusetts Public Assistance Programs. Defendant knew that, if it were to breach these contracts with the Massachusetts Public Assistance Programs, the Massachusetts Public Assistance Programs' plan members and/or beneficiaries—Plaintiffs and Class Members—would be harmed.

184.    Defendant breached the contracts it entered into with the Massachusetts Public Assistance Programs by, among other things, failing to (i) use reasonable data security measures, (ii) implement adequate protocols and employee training sufficient to protect Plaintiff's PII from unauthorized disclosure to third parties, and (iii) promptly and adequately notify Plaintiff and Class Members of the Data Breach.

185.    Plaintiff and the Class were harmed by Defendant's breach of its contracts with the Massachusetts Public Assistance Programs, as such breach is alleged herein, and are entitled to the losses and damages they have sustained as a direct and proximate result thereof.

186.    Plaintiff and Class Members are also entitled to their costs and attorney's fees incurred in this action.

### COUNT III
**Unjust Enrichment**
**(On Behalf Of Plaintiff And The Class)**

187.    Plaintiff restates and realleges all of the allegations in paragraphs 1-142 as if fully set forth herein.

188.    Plaintiff and Class Members conferred a monetary benefit on Defendant. Specifically, they provided their valuable PII, directly or indirectly, to Defendant and/or its agents. In exchange, Plaintiff and Class Members should have received from Defendant the services that were the subject of the transaction and should have had their PII protected with adequate data security.

189.    Defendant knew that Plaintiff and Class Members conferred a benefit on it in the form their PII as well as payments made on their behalf as a necessary part of receiving benefits and/or services through the Massachusetts Public Assistance Programs. Defendant appreciated and accepted that benefit. Defendant profited from these transactions and used the PII of Plaintiff

and Class Members for business purposes.

190.    Upon information and belief, Defendant funds its data security measures entirely from its general revenue, including payments on behalf of or for the benefit of Plaintiff and Class Members.

191.    As such, a portion of the payments made for the benefit of or on behalf of Plaintiff and Class Members is to be used to provide a reasonable level of data security, and the amount of the portion of each payment made that is allocated to data security is known to Defendant.

192.    Defendant, however, failed to secure Plaintiff's and Class Members' PII and, therefore, did not provide adequate data security in return for the benefit Plaintiff and Class Members provided.

193.    Defendant would not be able to carry out an essential function of its regular business without the PII of Plaintiff and Class Members and derived revenue by using it for business purposes. Plaintiff and Class Members expected that Defendant or anyone in Defendant's position would use a portion of that revenue to fund adequate data security practices.

194.    Defendant acquired the PII through inequitable means in that it failed to investigate and/or disclose the inadequate security practices previously alleged.

195.    If Plaintiff and Class Members knew that Defendant had not reasonably secured their PII, they would not have allowed their PII to be provided to Defendant.

196.    Defendant enriched itself by saving the costs it reasonably should have expended on data security measures to secure Plaintiff's and Class Members' Personal Information. Instead of providing a reasonable level of security that would have prevented the hacking incident, Defendant instead calculated to increase its own profit at the expense of Plaintiff and Class

Members by utilizing cheaper, ineffective security measures and diverting those funds to its own profit. Plaintiff and Class Members, on the other hand, suffered as a direct and proximate result of Defendant's decision to prioritize its own profits over the requisite security and the safety of their PII.

197.    Under the principles of equity and good conscience, Defendant should not be permitted to retain the money wrongfully obtained Plaintiff and Class Members, because Defendant failed to implement appropriate data management and security measures that are mandated by industry standards.

198.    Plaintiff and Class Members have no adequate remedy at law.

199.    As a direct and proximate result of Defendant's conduct, Plaintiff and Class Members have suffered and will continue to suffer other forms of injury and/or harm.

200.    Defendant should be compelled to disgorge into a common fund or constructive trust, for the benefit of Plaintiff and Class Members, proceeds that they unjustly received from them. In the alternative, Defendant should be compelled to refund the amounts that Plaintiff and Class Members overpaid for Defendant's services.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, on behalf of herself and Class Members, requests judgment against Defendant and that the Court grant the following:

A.    For an Order certifying this action as a class action and appointing Plaintiff and her counsel to represent the Class, pursuant to Federal Rule of Civil Procedure 23;

B.    For equitable relief enjoining Defendant from engaging in the wrongful conduct complained of herein pertaining to the misuse and/or disclosure of Plaintiff's and

Class Members' PII, and from refusing to issue prompt, complete and accurate disclosures to Plaintiff and Class Members;

C.   For injunctive relief requested by Plaintiff, including, but not limited to, injunctive and other equitable relief as is necessary to protect the interests of Plaintiff and Class Members, including but not limited to an order:

    i.    prohibiting Defendant from engaging in the wrongful and unlawful acts described herein;

    ii.    requiring Defendant to protect, including through encryption, all data collected through the course of their business in accordance with all applicable regulations, industry standards, and federal, state or local laws;

    iii.    requiring Defendant to delete, destroy, and purge the personal identifying information of Plaintiff and Class Members unless Defendant can provide to the Court reasonable justification for the retention and use of such information when weighed against the privacy interests of Plaintiff and Class Members;

    iv.    requiring Defendant to implement and maintain a comprehensive Information Security Program designed to protect the confidentiality and integrity of the PII of Plaintiff and Class Members;

    v.    prohibiting Defendant from maintaining the PII of Plaintiff and Class Members on a cloud-based database;

    vi.    requiring Defendant to engage independent third-party security auditors/penetration testers as well as internal security personnel to

conduct testing, including simulated attacks, penetration tests, and audits on Defendant's systems on a periodic basis, and ordering Defendant to promptly correct any problems or issues detected by such third-party security auditors;

vii.  requiring Defendant to engage independent third-party security auditors and internal personnel to run automated security monitoring;

viii.  requiring Defendant to audit, test, and train their security personnel regarding any new or modified procedures; requiring Defendant to segment data by, among other things, creating firewalls and access controls so that if one area of Defendant's network is compromised, hackers cannot gain access to other portions of Defendant's systems;

ix.  requiring Defendant to conduct regular database scanning and securing checks;

x.  requiring Defendant to establish an information security training program that includes at least annual information security training for all employees, with additional training to be provided as appropriate based upon the employees' respective responsibilities with handling personal identifying information, as well as protecting the personal identifying information of Plaintiff and Class Members;

xi.  requiring Defendant to routinely and continually conduct internal training and education, and on an annual basis to inform internal security personnel how to identify and contain a breach when it occurs and what to do in response to a breach;

xii.   requiring Defendant to implement a system of tests to assess its respective employees' knowledge of the education programs discussed in the preceding subparagraphs, as well as randomly and periodically testing employees compliance with Defendant's policies, programs, and systems for protecting personal identifying information;

xiii.   requiring Defendant to implement, maintain, regularly review, and revise as necessary a threat management program designed to appropriately monitor Defendant's information networks for threats, both internal and external, and assess whether monitoring tools are appropriately configured, tested, and updated;

xiv.   requiring Defendant to meaningfully educate all Class Members about the threats that they face as a result of the loss of their confidential personal identifying information to third parties, as well as the steps affected individuals must take to protect themselves;

xv.   requiring Defendant to implement logging and monitoring programs sufficient to track traffic to and from Defendant's servers; and

xvi.   for a period of 10 years, appointing a qualified and independent third party assessor to conduct a SOC 2 Type 2 attestation on an annual basis to evaluate Defendant's compliance with the terms of the Court's final judgment, to provide such report to the Court and to counsel for the class, and to report any deficiencies with compliance of the Court's final judgment;

D.   For an award of actual damages, compensatory damages, statutory damages, and nominal damages, in an amount to be determined, as allowable by law;

E.   For an award of punitive damages, as allowable by law;

F.   For an award of attorneys' fees and costs, and any other expenses, including expert witness fees;

G.   Pre- and post-judgment interest on any amounts awarded; and

H.   Such other and further relief as this court may deem just and proper.

**DEMAND FOR JURY TRIAL**

Plaintiff demands a trial by jury on all triable issues.

DATED: August 30, 2023             Respectfully submitted,

*/s/    Randi Kassan*
Randi Kassan
**MILBERG COLEMAN BRYSON
PHILLIPS GROSSMAN, LLC**
100 Garden City Plaza
Garden City, NY 11530
Telephone: (212) 594-5300
rkassan@milberg.com

David K. Lietz*
**MILBERG COLEMAN BRYSON
PHILLIPS GROSSMAN, LLC**
5335 Wisconsin Avenue NW
Washington, D.C. 20015-2052
Telephone: (866) 252-0878
Facsimile: (202) 686-2877
dlietz@milberg.com

*Counsel for Plaintiff and the Proposed Class*

**Pro Hac Vice* application forthcoming